| 11 | 225 |
|----|-----|
| 12 | 434 |

[No. 1325.]

## THE UNITED WATER WORKS CO., LIMITED, v. THE FARMERS' LOAN AND TRUST CO. ET AL.

1. PRACTICE—APPOINTMENT OF REFEREE.

Where the matters in issue in an action were referred to a party to hear evidence and report his finding of fact and conclusions of law to the court, the fact that in the order of reference he was designated as " special master", instead of a referee, did not affect his authority. By the order of reference he became a referee for the purposes for which he was appointed with all the powers, prerogatives and duties which our statute and the order of the court laid on him. The findings of fact by the referee, approved by the lower court, are binding on the court of appeals, if they are sustained by the evidence, or if they rest on conflicting testimony.

2. INTEREST COUPONS—SALE—PAYMENT.

Where the possession of detached interest coupons is transferred without an express agreement between the parties as to whether the transfer is one of sale or payment, if the party receiving them is not the debtor or his agent or some one whose duty it is to pay them, the presumption is that the transfer is one of sale, but if the party receiving them is the debtor or his agent or some one whose duty it is to pay them, then the presumption is that the transfer is one of payment, and in order to hold such transfer to be a sale of the coupons, it must be shown that the holder intended to sell them. And this presumption is stronger where the holder who transfers the coupons is interested in reducing the amount of the debt secured. The facts of this case held to establish a payment and not a sale.

*Error to the District Court of Arapahoe County.*

A BRIEF statement of a few facts which will not otherwise appear in the opinion will afford those who are not directly concerned in the suit a little clearer notion of the matters involved. There were several corporations organized to supply the city of Denver with water. The method and character of their formation, the conditions of their various charters, or the law under which they operated in no manner affects the question at issue. Their existence and nature, and their bonded issue is likewise relatively unimportant except as it

VOL. XI—15

serves to make plain what was done between the parties who are directly concerned in the litigation. The Denver City Water Company issued $250,000 worth of ten per cent bonds in July, 1871. This corporation was succeeded in interest by the Denver Water Company which in 1890 issued two millions and a half of seven per cent bonds. The Denver City Water Works Company, which succeeded in interest the other two corporations in November, 1896, issued a large amount of bonds, to wit: some seven millions of five per cent bonds. This is a sufficiently exact statement of the bonded condition of these corporations, and neither the bonds nor the debt of these various companies will be otherwise stated than by reference to the various bonded issues as 10's, 7's and 5's as the case may be. If the bonded issue is in any respect inaccurately stated, as to date or amount, it is entirely unimportant because this in nowise bears on the questions decided. In March, 1891, a written contract was entered into between the Denver City Water Works Company and the American Water Works Company of Illinois, and C. H. Venner & Co. of New York and Boston. In considering the opinion it must be borne in mind that the American Water Works Company of Illinois was not the American Water Works Company of New Jersey, which was the ultimate successor in interest, and the distinction between these two corporations must be borne in mind. The American Water Works Company of Illinois was a concern which dealt in either the securities or the waterworks plants of different localities, and was apparently the owner of the plant in Omaha, Nebraska. About this time a scheme was devised for the consolidation of the Omaha and Denver plants, the reorganization of the concern, and the creation of a new corporation which should succeed to the title and ownership of the water companies in the two cities. We have not examined this question with care, and shall not attempt to state just what the facts were in this particular. It is enough to state that the plan contemplated another corporation which should be the successor in interest, and the owner of the two plants. In March, 1891, the American

Water Works Company of Illinois had assumed to carry out and complete very extensive enlargements and improvements of the plant in Denver, and the contract of March was partly in furtherance of this scheme. By the terms of that contract the Water Works Company of Illinois was to be relieved of its obligation to furnish the funds necessary to extend and complete the works and a new fund was to be provided in a different way by Venner & Co. This firm was a banking firm, having its principal office at that time in New York, and a branch office in Boston, and was composed at that time of C. H. Venner and Wm. A. Underwood. We shall only state a very brief outline of the contract because its terms are of very little significance. According to that agreement, it appeared that the Denver company in its scheme of reorganization had provided for the issue of 4,000 bonds of $1,000 each, making a $4,000,000 issue, which was to be disposed of in this general way; a large proportion of them were to be devoted to taking up the outstanding bonds which were rapidly maturing so that this issue would stand as a consolidated one representing the bonded indebtedness, and paying sundry and divers obligations of the company, which would leave a balance, as appears, of about 647 bonds, which were unappropriated to any other specific purpose. According to the terms of that agreement this last lot of 647 bonds were to be turned over to C. H. Venner & Co. and the Denver corporation was to receive a credit on their books for the value of them at ninety, which would make a fund of nearly $550,000, for use of that company for the purposes of construction. There is a claim made by Mr. Venner in his testimony, and it seems to be reasserted by counsel, that under that agreement he was only bound to advance $60,000 by a fixed date. We do not find this claim supported by the record, nor was it agreed to by the parties, nor do we deem it as at all material, and we simply dispose of it with this simple reference. In point of fact this lot of bonds was turned over to Venner & Co. who on their books gave credit to the Denver corporation at the agreed value of ninety, and by the terms of this

agreement of March, this fund was to be used for construction purposes, and it went to an account, called the construction account. According to that contract, the American Water Works Company of Illinois, which had undertaken the construction had the right to avail themselves of the fund up to the time of the organization of the new corporation in New Jersey. The New Jersey corporation was afterwards organized and became the owner of the plant, and according to the agreement this fund resulting from the transfer of the bonds to Venner & Co. thereupon became available to that corporation for the purpose of completing the projected extensions. This we deem a sufficiently adequate statement of the status of affairs to make the opinion entirely clear. Matters went on under this arrangement until there was a failure to meet the maturing obligations of the old corporations when foreclosure proceedings were commenced on some of the issues of the bonds by the Farmers' Loan & Trust Company, which was the trustee named in the bonds and coupons, and through which apparently these securities were payable. The foreclosure proceedings were begun in Arapahoe county. These proceedings went to a decree. Up to that time the coupons which are here in suit, amounting to about $72,000, were unprovided for. After the decree had been entered, the United Water Works Company, Limited, which was a New York corporation, doing business in Boston, and having its principal office there, although it had an office with Venner & Co. attempted to get into the litigation to protect what they claimed to be their rights with reference to these coupons. There was a mistake in the decree which is not material, but it compelled the parties to open it up for the purpose of amendment, and thereupon this latter corporation came in by petition, asserted that it was the owner of a lot of coupons, being 249 coupons of $50.00 each of the bonds of the Denver City Water Works Company, which fell due July 1, 1891, amounting to $12,450, and 1,706 coupons of $35.00 each of the bonds of the Denver Water Company, which fell due July 15, 1891, amounting to $59,710, and prayed that an account might be

taken of these coupons and that they be provided for and paid out of the results of the sale under the foreclosure proceedings. Thereupon a reference was ordered to A. B. Seaman, Esq., to take proof respecting them. On the hearing he adjudged them genuine, but found that they were paid at the time of their presentation, and that they were not valid and outstanding obligations entitled to share in the proceeds of the foreclosure. On exceptions to his report, the matter was again argued before the district judge, who confirmed the report and entered judgment accordingly, from which this error is prosecuted. Whatever other facts are essential to the decision or the statement will appear in the opinion as it proceeds.

Mr. WILLARD TELLER, Mr. H. M. ORAHOOD, Mr. E. B. MORGAN and Messrs. YEAMAN & GOVE, for plaintiff in error.

Messrs. WOLCOTT & VAILE, for defendants in error.

Mr. WM. W. FIELD, of counsel.

BISSELL, J., delivered the opinion of the court.

The last clause in the statement suggests a preliminary question respecting our power and our duty to examine the evidence by which the judgment is supported. By the very terms of the order which recited many of the matters to which we have already alluded, a reference was ordered to Mr. Seaman, who was appointed special master for this purpose. The order provided that the United Water Works Company, Limited, and all persons having any unpaid coupons should present them with their proofs within a time designated and on the closing of the proofs, Mr. Seaman was directed to report his conclusions and findings to the court. A good deal of stress is laid on the use of the words "special master." We are not advised as to the counsel who drew the order of reference, but whoever he was, he used a designation which

is totally unknown to our practice and foreign to our code and procedure. A reference was ordered to Mr. Seaman, and it makes no difference that he was called a special master, he thereby became and was a referee, and a referee only for the purposes for which he was appointed with all the powers, prerogatives, and duties which our statute and the order of the court laid on him. He was directed to report his findings and conclusions to the court. This language could have no other significance than that he was to report his findings of fact and conclusions of law on the proofs submitted to him. This he did, and his report is in the form recognized by the code and by the practice in the state, and in all respects is regular and sufficient as an expression of a finding of fact and a conclusion of law. As a matter of fact he found these coupons all to be genuine. He further found that they were paid and not purchased when they were presented to Venner & Co., and as an ultimate conclusion of law, that the intervenors were not entitled to participate in the proceeds of the foreclosure. According to the regular methods under our system, exceptions were taken to the report, and it was alleged by the excepting parties that he had erred both in the admission of testimony respecting the circumstances of the disposition of these coupons and in his conclusion that they had been paid and not purchased, and the parties sought to obtain a reversal of this interlocutory judgment. Counsel insist that under these circumstances we are obliged to disregard the findings of fact made by the referee and the confirmation by the trial court, and decide the case on the testimony and render such judgment as we deem proper. There is such vigorous and earnest argument in support of the respective contentions of the parties and the positions are so ingeniously and ably supported that we have measurably departed from the rule which would relieve us of this labor. We undoubtedly have the right to take the finding of the referee and judgment of the trial court on the testimony as absolutely conclusive of the facts, and assuming those facts to be true, the result would be inevitable, the opinion short and the citation of authorities

measurably limited. This practice would be entirely justified by a comparatively recent case in the supreme court. *Kimball v. Lyon*, 19 Colo. 266.

While we are of the opinion that this case is full authority and the situation an absolute warrant for us to pursue this course, we have read the abstract. Since counsel disagree so materially respecting its substance and accuracy, we have read the bill of exceptions and examined the exhibits, and we have come from this long and exhaustive labor completely satisfied that the facts were correctly found by the referee and we are in entire accord with the judgment of the court on the main question. While probably we are not bound to state the basis of our convictions, yet, because of the magnitude of the interests involved, we shall in the course of the opinion indicate what has served to convince us as to the precise matter on which the case turns. As will be recollected the coupons presented for allowance were of two issues, one lot amounting to $12,450, due July 1, and the other of the Denver Water Company of the 7's amounting to $59,710. The referee has found them all to be genuine. Whatever title the intervenors, the United Water Works Company, Limited, have to any of them was acquired by the transaction at the counter of C. H. Venner & Co., when the money which represented their face value was given to the holders as they presented them for payment or purchase on that date.

The character of these securities is thoroughly established. They are interest coupons to which both the law and commercial usages give a peculiar character. They are almost like bank notes, they pass from hand to hand by mere delivery. The title of the purchaser is valid against the world. "Possession and title," as it has been put, "are one and inseparable." To such an extent does this negotiable quality attach that mere possession undoubtedly affords presumptive evidence of title. *Murray v. Lardner*, 2 Wall. 110. *Vide* authorities *infra*.

On the strength of this negotiability the company insists it ought to have had judgment when they produced the cou-

pons which sufficiently proved that they were purchasers for
value. It is complained that error was committed because
the company was compelled to do more than exhibit the se-
curities and take judgment. The company is in no position
to insist on it if it was error. When the petition of inter-
vention, if we may so call it was filed, and an order of refer-
ence made, no exception was taken to the order, at least, none
is exhibited in the abstract. When the matter came on for
hearing before the referee, instead of producing the coupons,
and relying upon that presumptive evidence of title and of
purchase because these interest coupons were in the hands of
third persons, who were under no obligations to pay or care
for them, the company voluntarily put C. H. Venner on the
stand and examined him to the point that the company did pur-
chase the coupons in open market for value, and through him
and his identification produced what was claimed to be written
authority from the corporation to Venner & Co., to buy them
for their account. Such circumstances attended the alleged
purchase as to properly open the inquiry, whether the trans-
action was a purchase or a payment. The importance of it
is presented in more aspects than one. If the United Water
Works Company, Limited, were purchasers for value, they
were not only entitled to share in the proceeds of the fore-
closure, but their claim was a preferred one. Since such ex-
traordinary preferential rights were annexed to these securities,
it was and is, vital to the interests both of the bond and the
coupon-holders acquiring title under the decree and to those
of the claimant. The question of purchase or payment then
becomes radically and significantly the controlling inquiry.
If we concede that the company were actual purchasers, and
that they sustained no relation whatever to the defaulting
corporation and bought in open market, their rights are clearly
defined, and about them the cases do not disagree.

What is essential to a sale is equally well settled. The
law is probably more accurately and exactly stated in the
opinion of Mr. Justice Strong in *Ketchum v. Duncan*, than it

would be expressed if I should attempt to paraphrase it. Quoting his language, it is :

" We may admit, also, that ' where, as in this case, a sale, compared with payment, is prejudicial to the holdor's interest, by continuing the burden of the coupons upon the common security, and lessening its value in reference to the principal debt, the intent to sell should be clearly proved.' But the intent to sell, or the assent of the former owner to a sale, need not have been expressly given. It may be inferred from the circumstances of the transaction. It often is. In the present case, the nature of the subject cannot be overlooked. Interest coupons are instruments of a peculiar character. The title to them passes from hand to hand by mere delivery. A transfer of possession is presumptively a transfer of title. And especially is this true when the transfer is made to one who is not a debtor, to one who is under no obligation to receive them or to pay them. A holder is not warranted to believe that such a person intended to extinguish the coupons when he hands over the sum called for by them and takes them into his possession. It is not in accordance with common experience for one man to pay the debt of another, without receiving any benefit from his act. We cannot close our eyes to things that are of daily occurrence. It is within common knowledge that interest coupons, alike those that are not due and those that are due, are passed from hand to hand ; the receiver paying the amount they call for, without any intention on his part to extinguish them, and without any belief in the other party that they are extinguished by the transaction. In such a case, the holder intends to transfer his title, not to extinguish the debt. In multitudes of cases, coupons are transferred by persons who are not the owners of the bonds from which they have been detached. To hold that in all these cases the coupons are paid and extinguished, and not transferred or assigned, unless there was something more to show an assent of the person parting with the possession that they should remain alive, and be available in the hands of the person to whom they were delivered,

would, we think, be inconsistent with the common understanding of business men."

When the law is thus clear and there is no dispute about any phase of it applicable to the case presented, the only matter left for argument is purely one of fact. That such is the opinion of counsel is quite apparent when we observe that out of nearly three hundred pages of brief matter, fully seventy-five per cent is an argument on the facts. At this we are not surprised because this seems to have been a peculiarity in all the cases wherein this question has arisen. The very case on which the plaintiff in error most relies, *Ketchum v. Duncan*, *infra*, is of this precise description. The court composed of some of the most learned and able jurists in the country divided on a pure matter of opinion about the testimony. Five of them thought the sale was established and the title of the purchasers should be affirmed. Four of them, even on the strong showing of good faith, evident purchase, public notice, lack of fraud, absence of duty owing by the purchasing agent to either the debtor company or the holders of the coupons, could not agree that there had been a sale. This on the narrow ground "that the holders had no thought of selling them, and in fact did not sell them, and, therefore, in law they were paid and not sold." Thus in this case, the point on which it turns is, did Venner & Co. buy the coupons for and on account of the United Water Works Company, Limited, and under circumstances which made the transaction one of purchase and sale whereby that corporation is entitled to share in the distribution. The referee found the facts otherwise. On exceptions the trial judge confirmed the report. We are bound by these conclusions if they are sustained by the evidence, or if they rest on conflicting testimony and there is evidence in the record on which they can be sufficiently rested. Of this there is in our minds neither doubt nor uncertainty. We are thoroughly convinced not only that the preponderance of the evidence sustains the findings and the judgment, but also that it would support none other. In deference to the vigorous, acute, and powerful onslaught made on the proofs as well as

to support the judgment of the *nisi* tribunals, and to maintain so far as may be the justness of our convictions, we shall .state the salient circumstances of the alleged purchase, and what has measurably served to convince us of the righteousness of the judgment.

We will now recur to the actual relation which Venner & Co. sustained to these various water companies, the obligations they were under, the duties they had to perform, and state the course of dealing between them. It will be remembered that the contract was made the 1st of March between Venner & Co., the American Water Works Company of Illinois, and the Denver corporations. Under it, the bonds were deposited with Venner & Co., to the credit of the construction account. The water works company proceeded to perfect extensive plans, lay mains, and do the various things essential to the scheme which had been agreed on. In carrying out these arrangements drafts were from time to time drawn on Venner & Co., to meet the expenses of construction, and for the payment of other items which might properly be included in that account. Antecedent to this date, Venner & Co. had paid the interest which accrued on some of the bonds. It clearly appears that the interest money of January, 1891, and of May, 1891, was remitted by draft to Venner & Co. to care for these coupons. It is not entirely clear whether as an universal proposition, the coupons were presented at the counter of Venner & Co. for payment, or to the agent named in the securities, the Farmers' Loan & Trust Company, and the holders directed to apply to Venner & Co. for the money. Mr. Venner was neither frank nor ingenuous in his statement of the transactions, and we cannot safely rely on his accuracy in these particulars. An officer of the Denver companies testified directly to sending the drafts to Venner & Co. to pay these coupons. As matters progressed and along in May and June, Venner & Co. apparently became somewhat embarrassed—whether because they were unable to place the bonds which had been delivered to them, or whether because their funds became insufficient to carry out their contract,—we do

not know. At all events money was required and a plan was suggested as early as the 21st of May, by Venner & Co. to transfer funds from what was known as the operating depart-. ment to the construction account. It must be remembered that the construction account was to be provided for by the proceeds of the 647 bonds. The water company, both the old and the new, and probably also Venner & Co. ran these two accounts on their books as separate items. It was not simply a matter of bookkeeping, but it was a plan adopted to carry out the agreement of the parties. It must be conceded the credit with Venner & Co. was in the name of the water company, and that the money realized from the operation of the plant was part of the working capital of the same corporation and in one aspect it was like two accounts in two different banks, standing in the name of the same individual and subject to his check. -But under the agreement of these parties it was something else. By the contract Venner & Co. were to provide the agreed value of these bonds for construction purposes. The company operated the plant, sold and delivered water, collected the rents and fees due it from user, both private and public, and the profits or the funds thus resulting were held by the companies to defray operating expenses and to liquidate the interest accruing on their securities. Under these circumstances it was not a matter of bookkeeping, but it was a matter of life and death to the corporation itself. As early as May and running from that on to the 15th of July, there were frequent suggestions from that partnership to transfer funds from the operating to the construction department, and thereby relieve the firm from financial pressure.

According to the testimony, it was distinctly agreed by Venner & Co. that if these advances should be made from the operating to the construction account for their relief they would pay the coupons as they fell due. It was claimed by Mr. Venner on the stand that the firm made no such agreement, and that none was made which bound it. It is not true. Underwood was a member of the firm, and he distinctly agreed that if the funds should be trans-

ferred from the one account to the other, the firm should pay the coupons when presented.   This bound Mr. Venner. It was made by his partner within the scope of his authority, and Venner cannot now be heard to say that the agreement was not made.   More than that, this contract is clearly established by the telegrams sent from the New York office by Venner himself.   In them he requests the transfer of funds from the one account to the other to relieve the pressure.   On June 20, he sent the following despatch: "Yes, please arrange transfer; we want a little breathing spell." He was immediately advised, as appears from the despatches sent him, that the transfer was made, and to it neither he nor his firm made any objection, and they thereby assumed the obligation to carry out the arrangement.   This transfer amounted to more than $70,000, which was enough to protect the coupons which, on the strength of Venner's testimony, are presented as outstanding claims against the corporation.   Further than all this, we find scattered through the accounts rendered by Venner & Co. to the water companies in Denver, statements covering a period of several months, from which it appears that from time to time Venner & Co. paid interest coupons amounting to many thousands of dollars on various descriptions of securities, thus tacitly admitting their obligation to pay them.   When we come to the exact transaction which occurred on the 15th of July when the purchase was alleged to have been made, we find no evidence of a sale, but all the evidences of a payment.   We have the testimony of some sixteen or eighteen different banking institutions and bankers, who held bonds of these water companies for themselves and for their customers, who received coupons for the purposes of collection, and they all state that these coupons were sent by them, either as agents of the holders, or as owners themselves, to their banking agents in New York for collection; that they were presented, reported paid, and the money placed to the account of the respective holders of the bonds.   Nothing occurred to indicate to the people who owned the bonds, or who acted as agents for the owners, that the cou-

pons had been purchased and not paid. Nothing suggested to those who presented them that the transaction was one of purchase and not of payment. It is quite true Venner says that they were all told the interest coupons were being purchased and not paid. We must be permitted not to credit this statement; in the first place, it was made without information, because when Mr. Venner was questioned as to the persons to whom these statements were made, he was unable to give any data or information on this subject. The payments were made by his cashier, and with the various items and transactions he was himself unfamiliar. We all know that such must be the fact. There was nothing to advise the public that these coupons were to be purchased; notices were not distributed about the bank nor sent to the various owners to acquaint them of this intention, and if the transaction was one of purchase, it was a secret purchase of which the holders were not advised. Further, Mr. Venner is discredited by his own statements. The only authority and the only evidence of the alleged purchase was a letter which he presented, which he says was sent by Mr. Mills, who was his representative in Boston of the Boston branch of his house, but sent as treasurer of the United Water Works Company, Limited, addressed to him in New York, and dated on the 14th day of July, authorizing Venner & Co. to purchase the seven per cent coupons of the water company, due July 15, 1891, and inclosing a draft for $70,000 for the purpose. But, regardless of this mode of transfer, there would have been other evidence than that letter to show the transfer of that fund. It would have appeared in three sets of books. It would appear on the books of Venner & Co. in Boston; it would appear on the books of the United Water Works Company, Limited, in Boston, and on the books of Venner & Co. in New York. There was no attempt to establish the fact by competent and direct testimony. We are without the testimony of Mr. Mills, and we are without the testimony of anybody connected with any of these different business houses to substantiate an improbable transaction which worked grievous injury

to the defaulting corporation. Under these circumstances, we must be excused if we do not give full credit to these statements. But there is a bit of testimony in the record which demonstrates that the transaction was not as Mr. Venner contends. We find among the exhibits a telegram, dated on the 15th of July, the date of the maturity of the coupons, which is, "wire estimate amount due for materials and labor to date, outside of Shickle June bill and Colorado Iron May bill and acceptances. Will wire later about Holly, but fear cannot do it, and care for coupons." This telegram was sent on the day on which the coupons fell due, and on which they were to be paid, and necessarily after the writing of the letter from the United Water Works Company, Limited, by Mr. Mills, and presumably after its receipt. It clearly recognized the obligation Venner & Co. were under to pay these coupons on the the 15th as they were presented. There is nothing in the record, other than the naked statement of Mr. Venner, who is so entirely discredited by these circumstances and these facts, to show that the transaction was a purchase and not a payment. Subsequently, Venner & Co. attempted to dispose of a lot of the bonds which the firm held. They corresponded with the representatives of different savings banks and other financial institutions with reference to the sale. In this correspondence Mr. Venner stated that he knew nothing to impair the value or character of the securities, and he offered blocks of them at ninety-seven and a half and interest. To at least two representatives of financial institutions he stated that these coupons were paid. We admit that he denies it in one case, and in the vain hope to add to the strength of his own testimony unnecessarily attacks the character of the witness by whom the statement is proven. It was supported by a statement by his partner, Mr. Toby, that these coupons were outstanding and they had long been looking for them, and he intimated, if he did not directly state it, that the balance had been cared for. There are many other matters in the record which, to our mind, are equally convincing and strong to the point that there was no purpose on the part of

Venner & Co. to purchase the coupons when they were presented in July, but that they paid them, as they were bound to do under their agreement. Neither is there anything to show that the parties who presented these coupons at the counter of Venner & Co. sold them. The very case on which the main reliance of the plaintiff in error is rested, *Ketchum v. Duncan*, shows that there is something more than a purpose on the one side essential to a sale. The intent is necessary. The intent of the holder is necessary. This need not always be directly proven, but it may be inferred from circumstances, but that there must be circumstances from which it may legitimately be presumed is well established. If the transfer is made to an agent of the corporation, the holder has a right to presume that the purpose is payment and not purchase. These bonds were presented to the firm, which was then bound by a specific agreement to pay them. There was nothing to indicate to those who presented the coupons that they were being bought. Under these circumstances it may well be said neither party understood it to be a purchase, the holder did not intend to sell, nor did the buyer intend to purchase. It was therefore not a sale but a payment. *Ketchum v. Duncan*, 96 U. S. 659; *Commonwealth of Virginia v. Chesapeake & Ohio Canal Co. et al.*, 32 Md. 501; *Cameron v. Tome*, 64 Md. 507; *Lloyd v. Wagner*, 93 Ky. 644; *Fidelity Co. v. West Penn. R. R. Co. et al.*, 138 Pa. St. 494; *Haven v. Grand Junction R. R. & Depot Co.*, 109 Mass. 88; *So. Covington & C. S. Ry. Co. v. Gest*, 34 Fed. Rep. 628; Jones on Corp. Bonds & Mortgages (2d ed.), §§ 249, 253; *Union Trust Co. v. Monticello & Port Jervis Ry. Co.*, 63 N. Y. 311; *Smith v. Sac County*, 11 Wall. 139; *Vosbury v. Diefendorf*, 119 N. Y. 357; 2 Cook on Stock and Stockholders, § 772; *Farmers' Loan & Trust Co. v. Iowa Water Co.*, 78 Fed. Rep. 881; *United Water Works Company, Limited, v. Farmers' Loan & Trust Co.*, 82 Fed. Rep. 144.

We have barely outlined what has convinced us that the referee and the court were right. The record is full of material which might be used to strengthen and support the argu-

ment.   In view of the fact that we have a right to rely on the
findings of the referee and of the court, we think we have dis-
charged our duty to counsel when we have thus indicated in
a general way what has served to convince us.

The judgment of the court below is right, and it will be
affirmed.

*Affirmed.*