ANDERSON v. PENNSYLVANIA HOTEL CO. et al.

No. 6447.

Circuit Court of Appeals, Fifth Circuit.

March 23, 1932.

D. C. McMullen, of Tampa, Fla., for appellant.

Austin L. Richardson and Wm. G. King, both of St. Petersburg, Fla., for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

The property of the Pennsylvania Hotel Company in St. Petersburg, Fla., was subject to two bond mortgages, one dated January 15, 1925, securing $75,000 of bonds, and one dated May 15th, 1925, securing an issue of $225,000. Some of the bonds fell due on each anniversary of the respective mortgages, beginning in 1927, and the interest coupons fell due semiannually. All were payable at the First National Bank of St. Petersburg, which was trustee in the mortgages. Beginning November, 1927, the Pennsylvania Hotel Company obtained advances from First Securities Corporation, which was affiliated with the bank, to pay interest coupons as presented at the bank, and no default in interest occurred until November 15, 1929, and January 15, 1930. Five thousand dollars principal of the smaller series was paid off, but other maturing bonds of both series to the amount of $27,000 which fell due in 1927, 1928, and 1929 were not paid by the hotel company but were taken up by H. C. Case, who was the president of the company, by making loans from the bank on his notes secured by the bonds. Failures to pay taxes and paving assessments occurred in 1926, 1927, 1928, and 1929. Defaults in payment of interest, taxes, or assessments, or in performing any of the terms and conditions of the mortgages by express stipulation in each authorized, and on written request of holders of 51 per cent. of the bonds required, acceleration of their maturity and foreclosure. After the failure of the bank, A. M. Anderson as its receiver, without request of the bondholders, sought foreclosure in equity in behalf of all bonds including those the bank held by way of collateral security as above stated. The hotel company contended these bonds were paid, but the master reported otherwise. Thereupon Charles Wilson, owning $5,000 of bonds of the larger series, intervened in behalf of himself and other bondholders to contend that the bonds held by the bank should be at least subordinated to the claims of other bondholders because: (1) The bank was without authority to reissue bonds sent to it as trustee for retirement; (2) because it did not notify other bondholders that the bonds were not retired and thus misled them into thinking that their security was being improved by such retirement; and (3) by taking the bonds as collateral it had wrongfully assumed a position antagonistic to its trust. No testimony was taken under the intervention, but the court entered a decree subordinating the bonds held by the bank. The receiver appeals, assigning the subordination as the sole error.

Adverting first to the third objection of the bondholders, we see no impropriety in the trustee bank becoming a holder of bonds as collateral security or otherwise. No preference or priority is claimed for its bonds. Its interests as a bondholder are precisely those of other bondholders, and there is nothing to show that the trustee would be tempted to any breach of duty as against them. The hotel company might better complain, but in its last mortgage it expressly agreed that the trustee might "buy, sell, hold, own or deal in any of the bonds or coupons issued hereunder and secured by this mortgage." This permission binds also the bondholders who claim under the mortgage, and the intervener is one of them.

The second objection that the bank as trustee has misled the bondholders by not notifying them that the matured bonds had not been paid is not well taken. There is no provision in either mortgage making it the duty of the trustee to notify bondholders in case of default in payment. Its duty then is to consider whether it shall foreclose. While a default in payment of interest would be notified to each bondholder by the return of the coupons, when a principal bond is not paid it would hardly be possible to locate and notify all the bondholders for the time being. The duty to the particular bondholder who sends his matured bond in for payment to inform him whether it was paid or transferred is adverted to below. The intervener does not

assert that he or any of his associates had owned at maturity any of the bonds in question. If notified of the default they could not have obtained any preference. The defaulted bond would be equally good against them whether sent back to the owner or transferred to another. They could only have moved for a foreclosure. It is neither pleaded nor proven that they would have been benefited by an earlier foreclosure. The defaults in taxes and assessments existed since 1926, and were of public record and presumably known to them. The bondholders sought no foreclosure on account of them nor on account of the interest default, which must have been actually known to each of them. No fraudulent intent or even negligence on the part of the bank is alleged, and no benefit peculiar to it shown in the delay to foreclose; nor any such unfavorable change in position of the bondholders as to create an estoppel in pais. "An estoppel in pais does not operate in favor of everybody. It operates only in favor of a person who has been misled to his injury, and he only can set it up." Ketchum v. Duncan, 96 U. S. 659, 666, 24 L. Ed. 868. One bondholder, indeed, testified that in March, 1929, he bought two bonds of the larger series from a trust officer of the bank who told him there were two hundred and twenty odd thousand dollars of the bonds alive and the others had been redeemed and canceled as they matured. There were in fact no more bonds outstanding of that issue than the officer represented, but if the untruth of the latter part of the representation gives this bondholder any right of rescission or claim for damages against the bank, it is personal to him and not cause for preferring the bonds of all other bondholders nor for subordinating those then owned or those later acquired by H. C. Case.

The most serious contention is that as to other bondholders the contested bonds are paid. If the hotel company had directly or indirectly furnished its own funds to take up the matured bonds, they would stand paid, even though its intention had been otherwise. Cussen v. Brandt, 97 Va. 1, 32 S. E. 791, 75 Am. St. Rep. 762. The coupons taken up for it by First Securities Company are thus extinguished. But the bonds themselves were paid for by moneys borrowed by H. C. Case, and with the clear intention on his part and on the part of the bank which had them for collection that they should be not paid but purchased. They are payable to bearer and are negotiable instruments transferable by delivery. 3 R. C. L., Bills and Notes, § 20.

Though taken after due and subject to defenses, good title to them is presumptively in the holder and the burden is on the objectors to show the contrary. 3 R. C. L., Bills and Notes, § 190. It is plain that each bond came to the bank, the place of payment, at its maturity and for payment. It does not appear who any holder was, whether he authorized or ratified the transfer by delivery of his bond, or whether he held any additional bonds. It does appear that each got his money and is not complaining. If, when the hotel company failed to pay and the bank transferred a bond to Case, it was under a duty in remitting to the owner to inform him of the facts, it ought to be presumed that this duty was performed rather than breached. A retention of the money by the owner after notice would ratify the transfer. Of a transfer by consent of the owner of the bond no other bondholder could complain. But if it be assumed that the owner neither authorized nor ratified the transfer, the fact remains that he got all he expected or was entitled to receive, and his consent should ordinarily be presumed. If the owner has no further interest in the security involved, the rule is that where a secured note is deposited for collection and a person who is not legally bound to pay it does, with an intention to continue its existence and not to cancel it, pay money for it to the collecting agent and the owner receives the amount due him, the transaction is sustained as a purchase. Dodge v. Freedman's Savings & Trust Co., 93 U. S. 379, 23 L. Ed. 920; Sturgis v. Baker, 43 Or. 236, 72 P. 744. Sureties on the note are still bound. Capwell v. Machon, 21 R. I. 520, 45 A. 259. But where a sale as compared with a payment is prejudicial to the owner's interest by continuing the burden of the debt sent for collection upon a security common to other debts held by him and thus lessening its value with reference to them, the intent on his part to sell should be more clearly proved. Ketchum v. Duncan, 96 U. S. 659, 662, 24 L. Ed. 868. In the cited case, coupons from bonds were involved and the bondholders of course would prefer payment to a sale of them; but under all the circumstances it was concluded that the delivery of the uncanceled coupons, even when not shown to have been expressly authorized by their owners, was a sale and not an extinguishment of them. In Wood v. Guarantee Trust Co., 128 U. S. 417, 9 S. Ct. 131, 32 L. Ed. 472, it was held that where a third party with his own money takes up maturing coupons of the bonds of a corporation without the knowledge of the hold-

ers, it is a question of fact whether it is intended to be a payment or a purchase which leaves the coupons outstanding. The person claiming to have purchased in that case owned 19,500 out of 20,000 shares of the corporation's stock, and owned most of the bonds, and was engaged in selling them to the public. It was thought that as he was practically the company and interested in preserving the credit of the bonds for further sales, he as well as the coupon holders intended a payment, and it was so adjudged. Venner v. Farmers' Loan & Trust Co. (C. C. A.) 90 F. 348, 349, concerned coupons which Venner had taken up and sought on foreclosure to assert as preferred for payment over the bonds. Venner owned all the stock of one corporation involved, and Wiley, who also acted in the matter, owned practically all the stock of the other, and both were large owners of and interested in maintaining the credit of the bonds. Many of the coupons which they took up were perforated to show cancellation. It was unlikely that coupon holders would have sold the matured coupons since these had priority over the bonds and later coupons. The coupons were held paid and not purchased. United Water Works Co. v. Farmers' Loan & Trust Co. (C. C. A.) 82 F. 144, and United Water Works Co. v. Farmers' Loan & Trust Co., 11 Colo. App. 240, 53 P. 511, also involved Venner and similar situations and were similarly decided. United Trust Co. v. Monticello & Port Jervis Ry. Co., 63 N. Y. 311, 20 Am. Rep. 541, is discussed in Ketchum v. Duncan, supra, at page 667 of 96 U. S., 24 L. Ed. 868, where it is said that the money to take up the coupons was really advanced for the corporation and paid by its agent under an agreement to do so for it, and was not a case of purchase, but of agency for the debtor. Such also was the case of Virginia v. Chesapeake & Ohio Canal, 32 Md. 501, 545. Cameron v. Tome, 64 Md. 507, 2 A. 837, concerned the taking up of coupons on an agreement with the company that the coupons should be security for the advance. It was held a debt due by the corporation, but that the coupons were paid so far as the bondholders were concerned, emphasis being laid on their interest to reduce the outstanding debt, and on the admitted fact that they had never agreed to sell. We have found no case where the paper taken up was the bond itself instead of a coupon, but an analogy exists where several notes are secured by the same property. Such a case was Dodge v. Freedman's Savings & Trust Co., supra; but since all the notes there were taken up at once, there was no room to apply the thought that the holder had an interest not to sell. In Cussen v. Brandt, 97 Va. 1, 32 S. E. 791, 75 Am. St. Rep. 762, there were three secured notes owned by the same person, and two were restrictively indorsed to a bank for collection, and were at the request of the debtor taken up by a friend. They were subordinated to the third note on the ground that the owner had not agreed to sell, but had refused to do so. In McDonnell v. Burns (C. C. A.) 83 F. 866, the opposite conclusion was reached. In the last-named case there was no agreement with the debtor to take the notes up, but the transferee himself had a second mortgage on the security and may have acted to protect it. That fact also appears in the case at bar for H. C. Case had a $25,000 note against the Pennsylvania Hotel Company secured by a mortgage on the property junior to both bond mortgages. In neither case probably could subrogation be relied on, because the entire secured debt was not taken up (25 R. C. L., Subrogation, § 6), but the circumstance of a junior incumbrance to be protected is a further light upon the transaction. We think, however, the case at bar is fundamentally distinguishable from all those in which a payment resulted in that here it does not appear that any person whose bond was taken up had any further interest in the security. Having gotten his money in full, there is no reason to suppose that he would not have consented to the transfer or that he would at any time have wished to rescind it as unauthorized, repaying the money received. The intent of Case and the collecting agent to transfer is clear. The bank's presumptive title as holder is not overcome, and the bonds should share with the others of their respective series. The decree is modified by striking from it the language subordinating the $19,000 worth of bonds of Pennsylvania Hotel Company and the $8,000 worth of bonds of Pennsylvania Apartments Company held by the First National Bank of St. Petersburg, but is otherwise affirmed, with costs of appeal in favor of appellant.

Modified and affirmed.